1

2

3

4

5

6

7

8                        **IN THE UNITED STATES DISTRICT COURT**

9                       **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  TERRY COULTER, | ) Case No.: 1:10-cv-01937 AWI JLT |
| 12 | ) FINDINGS AND RECOMMENDATION |
|                       Plaintiff, | ) DIRECTING REMAND PURSUANT TO |
| 13 | ) SENTENCE FOUR OF 42 U.S.C. § 405(g) |
|       v. | ) AND DIRECTING ENTRY OF JUDGMENT |
| 14 | ) IN FAVOR OF PLAINTIFF TERRY COULTER |
| | ) AND AGAINST DEFENDANT |
| 15  COMMISSIONER OF SOCIAL SECURITY, | ) COMMISSIONER OF SOCIAL SECURITY |
| 16 | ) |
| | ) (Doc. 1) |
|                       Defendant. | ) |
| 17 _____ | ) |

18          Plaintiff, Terry Coulter, asserts he is entitled to disability insurance benefits and supplemental

19  security income under Titles II and XVI of the Social Security Act.  He argues the administrative law

20  judge erred at step-two of her evaluation.  In addition, Plaintiff asserts the ALJ failed to give legally

21  sufficient reasons for rejecting Plaintiff's credibility and the opinion of the treating physician.

22  Further, Plaintiff contends the vocational expert identified jobs beyond his reasoning ability.

23  Therefore, Plaintiff seeks judicial review of the administrative decision denying his claims for

24  benefits.

25          For the reasons set forth below, the Court recommends the matter be remanded pursuant to

26  sentence four of 42 U.S.C. § 405(g) for further proceedings.

27  ///

28  ///

1

**PROCEDURAL HISTORY**[1]

2        Plaintiff filed applications for disability insurance benefits and supplemental security income

3 on March 19, 2008, alleging disability beginning March 1, 2007.  AR at 115-31.  Plaintiffs'

4 applications were denied initially and upon reconsideration.  *Id.* at 60-64, 67-63.  Plaintiff requested

5 a hearing, which was held before an ALJ on November 18, 2009.  *Id.* at 29.  The ALJ determined

6 Plaintiff was not disabled under the Social Security Act from March 1, 2007 through the date of the

7 decision, and issued an order denying benefits on February 18, 2010.  *Id.* at 13-22.  Plaintiff

8 requested a review by the Appeals Council of Social Security, which denied review of the ALJ's

9 decision on February 21, 2011.  *Id.* at 1-4.  Therefore, the ALJ's determination became the decision

10 of the Commissioner of Social Security ("Commissioner").

11

**STANDARD OF REVIEW**

12        District courts have a limited scope of judicial review for disability claims after a decision by

13 the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact,

14 such as whether a claimant was disabled, the Court must determine whether the Commissioner's

15 decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The

16 ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal

17 standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y*

18 *of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

19        Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a

20 reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S.

21 389, 401 (1971), quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938).  The record as a whole

22 must be considered, because "[t]he court must consider both evidence that supports and evidence

23 that detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

24

**DISABILITY BENEFITS**

25        To qualify for benefits under Titles II and XVI of the Social Security Act, Plaintiff must

26 establish he is unable to engage in substantial gainful activity due to a medically determinable

27

28

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

2

physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The claimant bears burden of proof of establishing his disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  Then the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## DETERMINATION OF DISABILITY

To obtain uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1994).  The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity[2] during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level.  *Id.* In making these determinations, the ALJ must consider objective medical evidence and opinion (hearing) testimony.  20 C.F.R. §§ 416.927, 416.929.

### A.  Relevant Medical Evidence

On January 29, 2007, Plaintiff had an MRI done on his lumbar spine.  AR at 699.  At the L4-5 and L3-4 levels, there was "a moderate-sized diffusely bulging disc, without focal protrusion," and mild facet arthropathy with "borderline narrowing of the central spine canal."  *Id.*  In addition, there was "moderate narrowing" and the L4-5 level and "mild stenosis" of the subarticular recesses at L3-

---

[2] Substantial gainful activity is defined as "work that–(a) Involves doing significant and productive physical or mental duties; and (b) Is done (or intended) for pay or profit."  20 C.F.R. §§ 404.1510, 416.910.

1    4. *Id.* At the "lower two visualized thoracic disc spaces," the MRI revealed "mild degenerative disc

2    disease, without disc protrusion or significant disc bulge." *Id.*

3        On March 1, 2007, Plaintiff was admitted to the emergency room at St. Joseph Medical

4    Center, where he reported that he suffered an injury to his head at work, which caused him to lose

5    consciousness about an hour later.  AR at 328, 333. Plaintiff complained of a headache and neck

6    pain.  *Id.* at 343.  Evaluation in the emergency room revealed Plaintiff had "moderate central canal

7    stenosis at C3-4 and C4-5." *Id.* at 328. There was "severe central canal stenosis at C5-6, with a

8    question of acute cord contusion versus gliosis of the cord at that level." *Id.* In addition, an MRI

9    revealed a severe loss of intervertebral height at C5-6. *Id.* at 349.

10       At an appointment on March 13, 2007, to follow-up regarding his injury, Plaintiff reported

11   pain in his neck and right arm. AR at 316.  Plaintiff stated an epidural injection "really did not help

12   out" and caused "intensification of pain immediately after the injection." *Id.*  Plaintiff reported his

13   pain was "aggravated with sneezing, sitting, bending, coughing, lifting, driving, or twisting," and

14   was "about 10/10" in the morning. *Id.* at 317.   Dr. John Blair observed Plaintiff appeared "in mild

15   distress" and had "tenderness to palpation involving the mid cervical spine." *Id.* at 316. In addition,

16   Dr. Blair found Plaintiff's range of motion was full, but painful, and he had "excellent strength"

17   throughout the upper and lower extremities.  *Id.* at 316, 318.  Plaintiff elected to proceed with

18   surgery, which "consist[ed] of a single level anterior cervical decompression and fusion at the C5-6

19   level," which Dr. Blair performed on April 13, 2007.  *Id.* at 316, 320.

20       On April 15, 2007, Plaintiff was found unconscious by his roommates and "had seizure

21   activity." AR at 271, 273.  An electroencephalogram performed on April 16, 2007, showed "no

22   seizure activity." *Id.*  Plaintiff reported pain in his shoulders, numbness and tingling in both hands,

23   pain and weakness in his right arm, occasional blurred vision, and poor sleep on April 23, 2007. *Id.*

24   at 270.  In addition, Plaintiff admitted he was depressed, but had no suicidal thoughts. *Id.*

25       In May 2007, Plaintiff reported to Dr. Blair that his neck pain had decreased, but his

26   symptoms were "aggravated with lying down or sitting in a chair for a prolonged period of time."

27   AR at 364, 623.  Plaintiff said "[n]othing he does really alleviates his pain," and he suffered from

28   headaches, depression and sleep disturbance. *Id.* Dr. Blair opined Plaintiff was "responding well to

4

1   his surgery," and believed Plaintiff could "initiate some physical therapy."  *Id.*  Therefore, Plaintiff

2   was referred to Olympic Sports & Spine for physical therapy beginning May 31, 2007.  *Id.* at 618.

3          In June 2007, Plaintiff reported his pain was "about a 6/10," for which he took aspirin.  AR at

4   391.  Plaintiff said he was doing "much better," but reported stress and anxiety, as well as side

5   effects from taking Lexipro, which he had stopped taking.  *Id.* at 363.  Plaintiff reported he returned

6   to work, and his "[p]rimary position ha[d] been allocated to [a] new hire."  *Id.*  Dr. Blair believed

7   Plaintiff could perform light duty work, but noted Plaintiff would "need to sit/stand as tolerated."  *Id*.

8   at 391, 657-58.  On July 27, 2007, Dr. Blair gave Plaintiff "a full work duty release without

9   restrictions."  *Id.* at 672.

10         In August 2007, Plaintiff complained of irritability and pain in his back.  AR at 362.  Plaintiff

11  stated he did not have side effects from his medication, and his goal was to "stay focused."  Also,

12  Plaintiff reported his neck pain had significantly improved, but he was sleepy during the day.  *Id.* at

13  269. Dr. Zhu opined Plaintiff's "seizure appears to be stable at this point."  *Id.*  Dr. Zhu advised

14  Plaintiff "that sleep deprivation will trigger breakthrough seizures," and Plaintiff was "advised not to

15  drive until he [was] seizure free for six months."  *Id.*

16         Plaintiff had an epidural injection in his lumbar spine on September 10, 2007.  AR at 370.

17  Dr. Blair believed Plaintiff "tolerated the procedure quite well."  *Id.*  According to Plaintiff, "his pain

18  level was a 2 and immediately after the injection, the pain level was a zero."  *Id.*  On September 19,

19  2007, Plaintiff reported he felt the same since his last visit; his issues and concerns were

20  "headaches—and getting old."  AR at 361.  Plaintiff reported, "I quit my job" and that his goal was

21  to "continue to get better."  *Id.*

22         On November 5, 2007, Plaintiff reported his progress was "better" and he had "no[] serious"

23  issues or concerns.  AR at 360.  In addition, Plaintiff indicated he did not have side effects from his

24  medication.  *Id.*  Plaintiff stated his goal was to "get back to work in Cali[fornia]" and that he was

25  looking for work in California to be closer to his children.  *Id.*

26         In March 2008, Plaintiff began receiving treatment from the VA in Modesto, California with

27  Paula Wetherby, LCSW.  AR at 397, 437.  Plaintiff reported extreme difficulty concentrating

28  including, for example, when reading a newspaper or watching television.  *Id.* at 439.  Also, Plaintiff

1   reported he had little interest or pleasure in doing things, and felt down, depressed or hopeless

2   "[n]early every day." *Id.* In April 2008, Plaintiff said he still experienced manic episodes,

3   "irritability, little need for sleep, and pressured speech." AR at at 427. In May 2008, Plaintiff

4   "reported an improved mood." *Id.* at 408. At an appointment on June 4, 2008, Plaintiff said his

5   primary concerns were feeling overwhelmed and finding a job. *Id.* at 403. Plaintiff reported his

6   medication helped manage his agitation, but his anxiety had increased. *Id.* at 403-04. According to

7   Ms. Wetherby, Plaintiff's "recent and remote memory was poor." *Id.* at 405, 420.

8          Dr. Stefan Lampe performed a consultative mental examination on June 20, 2008. AR at

9   449-50. Plaintiff reported "a history of Bipolar Disorder and Posttraumatic Stress Disorder which he

10  has had for many years," as well as a history of depression. *Id.* at 449. Plaintiff reported "a history

11  of classic manic episodes with increased energy, going on buying sprees from the TV or online, and

12  then not knowing where to get the money, or just packing up and driving to the mountains and then

13  realizing two days later where he is and not really knowing how he has gotten there." *Id.* Dr. Lampe

14  opined Plaintiff was "slightly depressed," and his mood affect "was full range without lability." *Id.*

15  at 450. Dr. Lampe found no evidence of any psychosis, and no suicidal or homicidal ideations. *Id.*

16  Dr. Lampe believed Plaintiff's "Bipolar Disorder and Posttraumatic Stress Disorder ... appear[ed] to

17  be moderately well controlled," and Plaintiff's "prognosis [was] good overall." *Id.* Upon testing,

18  Plaintiff "was able to recall 1/4 objects after several minutes and recalled a second one with category

19  prompting." *Id.* According to Dr. Lampe, "From a psychiatric point of view, [Plaintiff] can relate

20  and interact with supervisors and co-workers. He can understand, remember and carry out simple as

21  well as more technical instructions. He can deal with the public. He is able to maintain

22  concentration and attention for two-hour increments." *Id.* Dr. Lampe opined Plaintiff was "able to

23  withstand the stress and pressures associated with an eight-hour workday on an ongoing basis." *Id.*

24         Dr. Richard Park, one of Plaintiff's treating phsyicians, completed an assessment of

25  Plaintiff's limitations and abilities on June 20, 2008. AR at 451. Dr. Park opined Plaintiff suffered

26  from chronic back pain, Posttraumatic Stress Disorder (PTSD), Bipolar Disorder, and chronic

27  obstructive pulmonary disease. *Id.* Dr. Park opined Plaintiff's condition was permanent, and his

28  prognosis was "fair to poor." *Id.* According to Dr. Park, Plaintiff was unable to work either full-time

6

1  or part-time, because Plaintiff could not stand for more than thirty minutes, bend, or lift over fifteen

2  pounds. *Id.* In addition, Dr. Park believed Plaintiff had "poor mental capacity due to PTSD and

3  anxiety." *Id.*

4       Dr. Tri Minh Pham performed a consultative physical examination on June 27, 2008. AR at

5  452-54. Dr. Pham found Plaintiff was "alert, oriented and not in any acute distress." *Id.* at 452. Dr.

6  Pham tested Plaintiff's range of motion in his cervical spine, lumbar spine, legs, hips, shoulders,

7  elbows, ankles, wrists, and knees. *Id.* at 453. Upon neurological examination, Dr. Pham opined

8  Plaintiff's muscle strength was "5/5 in both upper and lower extremities," and his gait was normal.

9  *Id.* Dr. Pham concluded Plaintiff had the ability to "walk, stand, sit, handle objects, carry or lift with

10  no restriction, [and] no limitation of range of motion." *Id.* Further, Dr. Pham found Plaintiff's lungs

11  were clear, with "no rhonchi or wheezing . . . [and] no shortness of breath." *Id.* Dr. James Glaser

12  reviewed the records and agreed that Plaintiff's physical condition was "non severe." *Id.* at 457.

13       Dr. Loomis completed a mental residual functional capacity assessment and psychiatric

14  review technique forms on July 24, 2008. AR at 459-72. Dr. Loomis believed Plaintiff suffered

15  from affective and anxiety-related disorders, including a "Mood/bipolar disorder" and "anxiety

16  disorder." *Id.* at 462, 465-66. Dr. Loomis opined Plaintiff was moderately limited his ability to:

17  understand, remember, and carry out detailed instructions. *Id.* at 459. Dr. Loomis found Plaintiff

18  had moderate difficulties in maintaining concentration, persistence, or pace. *Id.* at 470. Dr. Loomis

19  believed Plaintiff was "not significantly limited" in all other areas of understanding, memory,

20  concentration, persistence, social interaction, and adaptation. *Id.* at 459-60. Specifically, Dr.

21  Loomis concluded Plaintiff was "capable of understanding, remembering and carrying out simple

22  one to two step tasks" and had the ability "to maintain concentration, persistence and pace

23  throughout a normal workday/workweek as related to simple tasks." *Id.* at 461. In addition, Dr.

24  Loomis believed Plaintiff was "able to interact adequately with coworkers [and] supervisors without

25  difficulty dealing with the demands of general public contact." *Id.* Finally, Dr. Loomis believed

26  Plaintiff was "able to make adjustments and avoid hazards in the workplace." *Id.* at 461. In

27  addition, Dr. Loomis believed Plaintiff had "mild" limitations in his activities of daily living and

28  maintaining social functioning. *Id.* at 470.

1    On September 23, 2008, Dr. Roger Fast completed an assessment of Plaintiff's physical

2  residual functional capacity.  AR at 688-93.  Dr. Fast opined Plaintiff could lift and/or carry 20

3  pounds occasionally and 10 pounds frequently, stand and walk with normal breaks for a total of

4  about six hours in an eight-hour day, and sit with normal breaks for a total of about six hours in an

5  eight-hour day.  *Id.* at 69.  Plaintiff's ability to push or pull was unlimited.  *Id.*  Explaining these

6  conclusions, Dr. Fast noted,

> 7      Claimant alleges pain and despite his normal exam at CE (Dr. Pham tends to under report
>        findings) his pain allegation is credible.  He says he can walk a block and is limited in
> 8      all exertional activity.  On the other hand he has been looking for work according to
>        various entries in the TS MER.  His allegations are supported by disc bulging and
> 9      degenerative changes in lumbar MRI and by treatment for back pain.  Claimant has also
>        undergone surgical treatment for cervical stenosis.  His treater, Dr. Park, says he can't
> 10     work full time but in describing restrictions, he puts lifting limits at 15 lbs and standing
>        at 30 minutes which would be consistent with sedentary work.  However, his VA treaters
> 11     do not document significant physical limitations and encourage him to exercise, which
>        he says he does.

12

13  *Id.* at 689-90.  Based on these facts, Dr. Fast believed Plaintiff's impairments were severe, but agreed

14  with giving little weight to the opinion of Dr. Park.  *Id.* at 690.  According to Dr. Fast, "[a] light RFC

15  would be appropriate."  *Id.*  Further, Dr. Fast opined Plaintiff's postural limitations were restricted to

16  never balancing and having seizure precautions.  *Id.* at 691.  Environmental restrictions for Plaintiff,

17  due to his asthma and seizures, included avoiding concentrated exposure to fumes, odors, dusts,

18  gases, poor ventilation, and hazards such as machinery and heights.  *Id.* at 692.  Dr. Fast found no

19  further postural, manipulative, visual, or communicative limitations.  *Id.* at 690-92.

20    Dr. Garcia reviewed the records on September 26, 2008, and noted Plaintiff reported "an

21  improved mood due to med[ication] compliance."  AR at 696.  In addition, Dr. Garcia observed

22  there did "not appear to be any severe deterioration in his mental status [with] prescribed meds."  *Id.*

23  Accordingly, Dr. Garcia affirmed the limitation to simple, repetitive tasks.  *Id.*

24    Plaintiff had an MRI  on his lumbar spine on January 24, 2009.  AR at 734.  Radiologist

25  Peter Paullos opined the MRI revealed "mild multilevel disc desiccation and narrowing, most

26  prominent at L1-L2."  *Id.* at 735.  Also, it showed "mild discogenic edema at the inferior endplate of

27  the L1 vertebral body."  *Id.*  At L4-L5, Dr. Paullos found: "Mild broad-based bulge with minimal

28  encroachment on the lateral recesses bilaterally.  Moderate right and mild left-sided facet arthrophy

8

1   with a synovial cyst on the right. Mild right-sided neural foraminal narrowing." *Id.* at 736. Based

2   upon these observations, he concluded Plaintiff had "mild multilevel degenerative disc disease." *Id.*

3        Dr. Park offered a new assessment of Plaintiff's impairments on April 24, 2009. AR at 733.

4   He reported Plaintiff had chronic back pain, PTSD, bipolar disorder, COPD, and type II Diabetes.

5   *Id.* According to Dr. Park, Plaintiff's disability was permanent, and his prognosis was "fair." *Id.*

6   Again, Dr. Park opined Plaintiff was unable to work either full or part-time due to "back pain and

7   respiratory proble[ms]." *Id.* Dr. Park noted Plaintiff "cannot do strenuous activity, [or] bending."

8   *Id.* Also, Dr. Park believed Plaintiff could not stand for more than thirty minutes of lift an amount

9   equal to or greater than twenty pounds. *Id.*

10       Plaintiff had a consultation with Dr. Peter Barelka, a pain management physician, on July 7,

11  2009. AR at 751-55. Dr. Barelka noted,

12       The patient states that [h]is low back pain began 10 to 15 years ago aggravated with work
         at that time, which was that of a roofer. Pain has been progressively more bothersome
13       to him over the most recent years. Currently, it interferes with his activities of daily life,
         participating in activities which he considers enjoyable. Concerning the pain itself, it is
14       70% to 80% located in the left greater than right low back. He has the remainder of pain
         in his left leg along with numbness and tingling, which runs down his left greater than
15       right leg. He notes that on forward flexion of his neck and upper thoracic area the
         tingling gets worse. He states that essentially all activities including walking, laying
16       down in certain positions, standing for long periods of time, and even sitting for long
         periods of time exacerbate his pain complaints. Very few things will relieve it.
17       However, he has noted that TENS machines and heat will occasionally relieve it, as does
         Percocet.

18

19  *Id.* at 751. Dr. Barelka determined Plaintiff's "[r]ange of motion was decreased due to hesitation and

20  pain complaints," and his strength was "5/5." *Id.* at 753. Also, Dr. Barelka observed Plaintiff had

21  "trigger points on the right side of his lower lumbar region," and "walked with an antalgic gait with a

22  left limp." *Id.* at 753-54. Dr. Barelka recommended Plaintiff do physical therapy exercises "twice a

23  day to the point where he does not have exacerbation in his pain the following day." *Id.* at 754.

24       On July 13, 2009, Plaintiff reported compliance with his medication, and no side effects from

25  his medication. AR at 748. Plaintiff said he had experienced auditory and visual hallucinations. *Id.*

26  at 749. However, Dr. Elmer Ignacio found no signs of psychosis. *Id.*

27  ///

28  ///

9

1    **B.   Hearing Testimony**

2         *Plaintiff's Testimony*

3         Plaintiff testified before an ALJ on November 18, 2009.  AR at 29-49.  Plaintiff reported he

4    had completed the tenth grade and earned his GED in 1980.  *Id.* at 33.  Plaintiff stated he could read

5    a newspaper and do simple adding and subtracting with the assistance of a calculator.  *Id.*  Plaintiff

6    said he left his job as a material specialist voluntarily because he "knew [he] couldn't do it any

7    more" after being sick and in the hospital several times during his last year of work.  *Id.* at 34.

8         Plaintiff said he suffered a work injury in March 2007, when he hit his head and popped a

9    vertebrae in his neck.  AR at 40. Plaintiff said he had cervical fusion surgery on April 13, 2007.  *Id.*

10   He reported he returned to work after the surgery, but was restricted to "light duty for quite awhile"

11   because he could not perform "any normal duties," which included "mostly physical warehouse work

12   pulling orders, and unloading and loading trucks."  *Id.* at 40-41, 45.  Plaintiff testified he was

13   scheduled for full time work, but "could never get 40 hours in because of all the pain," and rather

14   worked twenty to thirty hours.  *Id.* at 41.  Plaintiff said, " I was just existing at work.  I was merely

15   being there, and they wouldn't let me do nothing."  *Id.*  Plaintiff said he "quit working altogether" on

16   September 4, 2007.  *Id.* at 35.

17        According to Plaintiff, he suffered from COPD, degenerative disc disease, post-traumatic

18   stress disorder, depression, and was bipolar.  AR at 24, 40.  Plaintiff said he felt constant pain in his

19   lower right back and both legs.  *Id.* at 39.  He described the pain "like being pierced with something

20   sharp."  *Id.*  Plaintiff reported that, on a scale of one to ten, with ten being the worst level of pain, his

21   pain was a "[a]bout a four" with medication.  *Id.* at 39-40.  Also, Plaintiff said he experienced

22   problems with his neck, including stiffness in the morning.  *Id.* at 41.

23        Plaintiff stated his mental health problems prevented him from holding a full-time job

24   because he lacked interest in doing anything.  AR at 40.  In addition, Plaintiff reported that being

25   bipolar "causes ups" and affected his concentration.  *Id.*  Plaintiff said he had received treatment for

26   his mental health since about 1990, but his mental health "has definitely gotten worse."  *Id.* at 42.

27   Specifically, Plaintiff reported his depression was worse, and his "manic episodes" were worse.  *Id.*

28   Plaintiff said that when he had a manic episode, he did not sleep "for days" and described it "like

10

1   being on an extreme high" where he felt he could "take on the world and do anything." *Id.*  Plaintiff

2   said episodes lasted about three days, and happened "once every four months or so." *Id.*

3       Plaintiff said he was able to dress and bathe without assistance.  AR at 35-36.  He stated he

4   did not cook, mop, sweep, or vacuum "[b]ecause the movement cause[d] pain." *Id.*at 36, 44.

5   Plaintiff said he washed dishes, did his own laundry, and went grocery shopping with his kids. *Id.* at

6   36.  Plaintiff said he did not have hobbies and he watched television an average of twelve hours a

7   day. *Id.*  Plaintiff reported he exercised twice a day for fifteen minutes by doing a "range of

8   motions" in his arms, legs, and neck, and believed he could "lift about 15 or 20 pounds." *Id.* at 36-

9   37, 39.  Also, Plaintiff testified he could drive for "[a]bout thirty minutes," and explained he had the

10  ability to "sit for about twenty to thirty minutes without having to stand for a few minutes." *Id.* at 37,

11  39.  Plaintiff believed he could walk "about 100 yards," but it would take twenty minutes. *Id.* at 39.

12  Plaintiff reported he experienced shortness of breath when he walked and when he finished doing the

13  dishes. *Id*. at 40.

14      He testified he received treatment from the VA for his medical problems, including mental

15  health.  AR at 37.  The ALJ noted Plaintiff was prescribed the following medications from the VA:

16  "Mirtazapine, Cylcobenzaprine, Triazolam, Clonazepam, Oxycodone, Arapreprasol (phonetic),

17  Trazodone, Ermaprasol (phoetic), Gabapetin, Sucralfate, Flumeseride (phonetic), [and] a Combivent

18  inhaler." *Id.* at 38.  In addition, Plaintiff said he used a TENS unit twice a day for fifteen to twenty

19  minutes. *Id.* at 43.  Plaintiff said his side effects from these medications included "[c]onstipation,

20  diarrhea, hand tremors, headache . . . [and] restlessness." *Id.* at 38-39.  Also, Plaintiff believed the

21  medication affected his memory and concentration, *id.* at 40, because he first noticed memory

22  problems "when [he] started taking certain medications like Mirtazapine, Cyclobenzaprine,

23  Clonazepam, and Oxycodone." *Id.* at 44.

24      Plaintiff testified that his back condition was "a progressive disease," and nothing else could

25  be done.  AR at 44.  Plaintiff said the condition was "beyond the point of surgery." *Id.*  Plaintiff said

26  his physical therapy was not helpful, but he was given a cane at physical therapy which he used

27  "[a]lways to relieve pressure on his right side. *Id.* at 43, 47.

28  ///

11

*Vocational Expert Testimony*

Following Plaintiff's testimony, vocational expert ("VE') David Dettmer testified at the hearing. The VE characterized Plaintiff's past relevant work as a warehouse worker, DOT[3] 922.687-058. AR at 46. The VE noted this job was characterized as medium work, SVP[4] level 2. *Id.* Then, the ALJ posed hypothetical questions for the VE's consideration.

The ALJ asked the VE to consider an individual of the same age, education, and past relevant work as Plaintiff. AR at 46. The ALJ indicated that in an eight-hour day, this individual could sit, stand, and walk six hours each. *Id.* Also, the person had the ability to "occasionally lift and carry 20 pounds, and frequently lift and carry 10 pounds." *Id.* The individual could never climb ladders, and was required to "avoid concentrated exposure to heights, moving machinery, dust, fumes, and smoke." *Id.* Finally, the worker was "limited to understanding, remember, and carrying out simple job instructions only." *Id.* The VE opined such a person could not perform Plaintiff's past work because "it was too heavy." *Id.* However, the VE believed there were jobs "at the light unskilled level." *Id.* As examples, the VE identified light jobs at SVP level 2, including cashier, DOT 211.462-010; mail clerk, DOT 209.687-026; and fast food worker, DOT 311.472-010. *Id.* at 46-47.

Plaintiff's counsel questioned if these jobs would be available if the worker "would need a sit/stand option." AR at 47. According to the VE, such a limitation "would have some effect," and the position of fast food worker would be eliminated. *Id.* In addition, the VE believed there would be an erosion of about 50 percent of the available jobs for mail clerks and about 75 percent for cashiers. *Id.* at 47-48. Further, Plaintiff's counsel questioned whether a person with "poor recent and remote memory" who was "moderately limited in concentration, attention and pace" would be able to perform the work of a cashier, mail clerk, or fast food worker. AR at 48. The VE observed,

---

[3] The *Dictionary of Occupational Titles* ("DOT") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy. *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The DOT classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

[4] "SVP," or specific vocational preparation, is defined as the amount of lapsed time required by a typical worker to learn techniques, acquire information, and develop the facility needed for average performance in a specific job position. Employment and Training Admin., U.S. Dep't of Labor, *DOT*, (4th ed. rev. 1991), page 1009.

1

2

3

> [M]oderate is defined as limited but still able to perform satisfactorily. Moderate concentration problems I don't see being overly problematic with basic cashier work and mail clerk, and given now that the cashiers now are automated, and it is not very difficult to do that job. I don't think it has a major impact. It's hard to say what poor recent and remote memory exactly means performance wise.

4   *Id.* Therefore, the VE concluded he did not see a "major difficulty with the eroded numbers." *Id.*

5   Likewise, the VE opined the use of a cane would have an effect and erode the bases in a similar

6   manner as the sit/stand option. *Id.* at 49.

7   **C.  The ALJ's Findings**

8       Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial

9   gainful activity from the alleged onset date of March 1, 2007, because his work activity after the

10  alleged onset date "did not rise to the level of substantial gainful activity." AR at 15.  Second, the

11  ALJ found Plaintiff had the following severe impairments: degenerative disc disease, chronic

12  obstructive pulmonary disease, seizure disorder, bipolar disorder, and posttraumatic stress disorder.

13  *Id.* The ALJ found no impairment or combination of impairments meet or medically equal one of

14  the listed impairments. *Id.* at 16.

15      The ALJ determined Plaintiff had the residual functional capacity ("RFC") "to perform light

16  work." *Id.* at 17. Specifically, the ALJ concluded Plaintiff had the ability to "lift and carry 10

17  pounds frequently and 20 pounds occasionally, and stand, walk, and sit six hours in an eight-hour

18  workday," but he "should avoid climbing ladders, and concentrated exposure to heights, moving

19  machinery, fumes, dust, and smoke." *Id.*  In addition, the ALJ found Plaintiff "can perform simple,

20  routine, tasks." *Id.*  With this RFC, the ALJ found Plaintiff was unable to perform any past relevant

21  work, but there were "jobs that exist in significant numbers in the national economy that [he] can

22  perform." *Id.* at 20-21.  Therefore, the ALJ concluded Plaintiff was not disabled as defined by the

23  Social Security Act. *Id.* at 21-22.

24                          **DISCUSSION AND ANALYSIS**

25  **A.  The ALJ erred in her evaluation of the medical evidence**

26      In this circuit, cases distinguish the opinions of three categories of physicians: (1) treating

27  physicians, (2) examining physicians, who examine but do not treat the claimant, and (3) non-

28  examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d. 821,

830 (9th Cir. 1996).  Generally, the opinion of a treating physician is afforded the greatest weight in disability cases, but it is not binding on an ALJ in determining the existence of an impairment or on the ultimate issue of a disability.  *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

A physician's opinion is not binding upon the ALJ when the ALJ provides "specific and legitimate" reasons for rejecting the opinion, supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).  When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict."  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  The ALJ's resolution of the conflict must be upheld by the court when there is "more than one rational interpretation of the evidence."  *Id.*; *see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").  Notably, the opinion of a treating physician may be rejected whether or not the opinion is contradicted by another.  *Magallanes*, 881 F.2d at 751.  Plaintiff argues, "The ALJ did not give sufficient reasons to reject Dr. Park's disability opinions."  (Doc. 15 at 4).

In evaluating the opinion offered by Dr. Park, the ALJ noted, "Little weight is given to Dr. Park's opinion because it is inconsistent with objective evidence in the record . . . [and] Dr. Park is an internist and is treating the claimant for his physical impairments, not his mental impairments."  AR at 18.  Significantly, however, that a treating physician was not a psychiatrist "is an improper basis for discounting the testimony of a treating physician."  *Sorenson v. Barnhart*, 69 Fed. Appx. 864, 865 (9th Cir. 2003) (citing *Lester*, 81 F.3d at 833).  Therefore, that Dr. Park was not a psychiatrist was not a legally sufficient reason for rejecting his opinion.

When a treating physician's opinion is unsupported by the objective medical evidence, the ALJ may identify conflicting evidence to set forth a specific, legitimate reason for discounting the opinion.  *See Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986).  The only conflicting evidence identified by the ALJ was "a January 2009 MRI which revealed only minor degenerative changes in

1   the claimant's lumbar spine."[5]   AR at 18.   The ALJ referenced other objective evidence "discussed

2   above" in her decision to give less weight to the opinion of Dr. Park, thereby incorporating the

3   opinions of Dr. Pham and Dr. Blair, and treatment notes from various visits.   *Id.*   However, the ALJ

4   failed to explain how the evidence "discussed above" or the MRI of Plaintiff's lumbar spine

5   contradicted the more recent findings of Dr. Park.

6      To disregard a treating physician's opinion, the ALJ has a burden to "set out a *detailed and*

7   *thorough summary* of the facts and conflicting clinical evidence, stating [her] interpretation thereof,

8   and making findings."   *Cotton*, 799 F.2d at 1408 (emphasis added).   Here, the ALJ offered only her

9   conclusions that the medical evidence contradicted the opinion of Dr. Park, without identifying and

10   discussing its conflict with opinions and treatment notes in the medical record.   Thus, the ALJ failed

11   to reject the opinion of Plaintiff's treating physician in a proper manner on the basis of a conflict

12   with objective medical evidence.

13      Because the ALJ did not set forth "specific, legitimate" reasons supported by substantial

14   evidence in the record for giving less weight to the opinion of Plaintiff's treating physician, Dr. Park,

15   the ALJ erred in her evaluation of the medical evidence.

16   **B.   Remand is appropriate in this matter**

17      The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or

18   to order immediate payment of benefits is within the discretion of the district court.   *Harman v.*

19   *Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).   Except in rare instances, when a court reverses an

20   administrative agency determination, the proper course is to remand to the agency for additional

21   investigation or explanation.   *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004), citing *INS v.*

22   *Ventura*, 537 U.S. 12, 16 (2002).   Generally, an award of benefits is directed when:

23      (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence,
    (2) there are no outstanding issues that must be resolved before a determination of
24      disability can be made, and (3) it is clear from the record that the ALJ would be required
    to find the claimant disabled were such evidence credited.

25

26   _____

27      [5]  Defendant identifies evidence that supports the ALJ's decision to give less weight to Dr. Park.  (*See* Doc. 18 at 8).  While the ALJ could have relied upon this evidence to reject the doctor's opinion, the ALJ did not.  Thus, it cannot be considered by the Court. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) (noting that a reviewing court "is constrained to review the reasons the ALJ asserts").

28

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).  In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the claimant's record has been fully developed.  *Varney v. Sec'y of Heath & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

Applying the *Smolen* factors to this case, the ALJ failed to set forth legally sufficient reasons to properly reject the opinion of Plaintiff's treating physician.  In addition to the issue addressed above, Plaintiff asserts the vocational expert identified jobs beyond Plaintiff's reasoning ability.  This issue is intertwined with the opinions of physicians and the RFC determination based thereon by the ALJ.  Moreover, the ALJ failed to assess Dr. Park's opinion as it related to other medical evidence in the record.  Consequently, the matter should be remanded for the ALJ to re-evaluate the medical opinions, because it is not clear from the record that the ALJ would be required to find Plaintiff disabled.

## FINDINGS AND RECOMMENDATIONS

For all these reasons, the Court concludes the ALJ erred in the evaluation of the medical evidence.  The ALJ failed to set forth legally sufficient reasons supported by substantial evidence in the record for giving less weight to the opinion of Plaintiff's treating physician.  As a result, the ALJ failed to apply the correct legal standards and the decision should not be upheld by the Court.  *See Sanchez*, 812 F.2d at 510.  Because the Court remand is appropriate on this matter, it offers no findings on the remaining issues presented by Plaintiff in his appeal.

Accordingly, **IT IS HEREBY RECOMMENDED**:

1.      This matter be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and

2.      The Clerk of Court be directed to enter judgment in favor of Plaintiff Terry Coulter and against the Commissioner of Social Security.

These Findings and Recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within fourteen days after being served with these Findings and Recommendations, any party may file

written objections with the court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   **January 12, 2012**                                        **/s/ Jennifer L. Thurston**
                                                                                      UNITED STATES MAGISTRATE JUDGE

17